IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MICHON R. FERGISON, )
)
         Plaintiff, )
)
v. )     1:16CV39
)
NANCY A. BERRYHILL,[1] )
Acting Commissioner of Social Security, )
)
         Defendant. )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Michon Fergison ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.     PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on January 26, 2012, alleging a disability onset date of January 19, 2012. (Tr. at 12, 138.)[2] Her claim was denied initially (Tr. at 65-73, 85-88), and that determination was upheld on reconsideration (Tr. at 74-84, 93-100).

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Carolyn W. Colvin as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #7].

Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 101.) Following the subsequent hearing on April 8, 2014, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 22), and, on November 13, 2015, the Appeals Council denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-5.)

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

2

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

3

Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

4

"perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

### III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" after January 19, 2012, her alleged onset date. Plaintiff therefore met her burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments: cardiomyopathy, obesity, hypertension, piriformis syndrome, bursitis of the right hip, carpal tunnel syndrome, lumbar strain/sprain, ankle strain/sprain, and plantar fasciitis/plantar fascial fibromatosis. (Tr. at 14.) The ALJ found at step three that none of these impairments met or equaled a disability listing. (Tr. at 15.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could

> lift up to 20 pounds occasionally and ten pounds frequently, sit up to six hours out of an eight hour day, except she can perform no more than two hours standing and walking in an eight-hour day. The restriction on standing and walking reduces the claimant to sedentary work. She can never climb ladders, ropes, and/or scaffolds, she can occasionally climb ramps and stairs and frequently, not constantly, use her bilateral upper extremities for fine and gross

> manipulations. She must avoid concentrated exposure to hazards, humidity, and extremes of cold and/or heat. Due to her fatigue, she is limited to performing only simple tasks, in that she can apply common sense understanding to carry out oral written and diagrammatic instructions.

(Tr. at 15-16.) Based on this determination, the ALJ found under step four of the analysis that Plaintiff could not perform any of her past relevant work. (Tr. at 20.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 21-22.)

Plaintiff now raises five challenges to the ALJ's decision. Specifically, she claims that the ALJ (1) failed to properly evaluate the opinions of Plaintiff's treating cardiologist, Dr. Eduardo Safille, (2) failed to "properly consider the impact of Plaintiff's carpal tunnel syndrome and accompanying manipulative limitations on the sedentary occupational base," (3) failed to perform a function-by-function analysis as to sitting limitations caused by Plaintiff's bursitis and back condition, (4) failed to "properly evaluate Plaintiff's obesity in conjunction with her other medical conditions as required by S.S.R. 02-1p," and (5) failed to properly account for Plaintiff's fatigue in limiting her to simple tasks. (Pl.'s Br. [Doc. #12] at 2.) After a careful review of the record, the Court concludes that the ALJ's errors in weighing Dr. Safille's opinions, along with his failure to properly account for Plaintiff's fatigue in the RFC, merit remand. Therefore, the Court need not consider at this time the additional issues raised by Plaintiff.

  A. Dr. Safille's Opinions

Plaintiff first contends that the ALJ erred in assigning little weight to the opinions of her treating cardiologist, Dr. Safille. Social Security Ruling ("SSR") 96-2p and 20 C.F.R.

6

§ 404.1527(c), collectively referred to as the "treating physician rule," generally require an ALJ to give controlling weight to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record," it is not entitled to controlling weight. See Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2; 20 C.F.R. § 404.1527(c)(2); see also Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178. Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)(i)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion.

Where an ALJ declines to assign controlling weight to a treating physician's opinion, he must "'explain in the decision the weight given' thereto and 'give good reasons in his . . . decision for the weight.'" Chirico v. Astrue, No. 3:10CV689, 2011 WL 6371315, at *5 (E.D. Va. Nov. 21, 2011) (unpublished) (quoting 20 C.F.R. § 404.1527(c)(2)). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." Thomas v. Comm'r of Soc. Sec., No. Civ. WDQ-10-3070, 2012 WL 670522, at *7 (D. Md. Feb. 27, 2012)

7

(unpublished) (citing Blakely v. Comm'r of Soc. Sec., 581 F.3d 399, 409 (6th Cir. 2009); Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011)).

In the present case, the ALJ addressed two opinions from Dr. Safille: a preliminary opinion dated September 3, 2013, and a more conclusive opinion dated April 15, 2014. With respect to the first opinion, on September 3, 2013, Dr. Safille issued a note stating that "[f]urther cardiac testing is necessary to gauge the patient's cardiac risks for a return to work. The patient is not yet released for a return to work." (Tr. at 537.) The ALJ assigned this opinion "little weight." In support of that conclusion, the ALJ noted that, "during the same month, [Dr. Safille] indicated the cardiac findings were stable. . . . Moreover, in October 2013, after the heart catheter showed negative findings, [Dr. Safille] recommended [Plaintiff] return in six months, which is inconsistent with his opinion from September 2013." (Tr. at 20.)

However, it is not clear how Dr. Safille's September 3, 2013 opinion is inconsistent this his treatment findings and recommendations at that time. As reflected in the records, Dr. Safille began treating Plaintiff in early 2012 after she was hospitalized with congestive heart failure and was diagnosed with postpartum cardiomyopathy. Dr. Safille continued treating Plaintiff in 2012, 2013, and 2014. With respect to the treatment records at the time of the September 3, 2013 opinion, the records reflect that on August 27, 2013, Plaintiff underwent a Myocardial Perfusion Imaging (MPI) Study. The results of that study reflect that:

> The left ventricle was dilated with stress and became smaller at rest. There was moderate global hypokinesis. Left ventricular EF is 36%.[5] Anterolateral wall motion is mildly hypokinetic. Apical wall motion is mildly hypokinetic. The anterolateal wall shows mild ischemia.

---

[5] An "EF" or "ejection fraction" is the percentage of blood leaving the heart each time it contracts, and an EF of 50% or higher is generally considered normal.

8

(Tr. at 490-91). Plaintiff went to an appointment with Dr. Safille a few days later, on September 3, 2013, the day of Dr. Safille's opinion. The office notes from that visit reflect the "Abnormal MPI" study set out above, with an EF of 36% and "Small Anterior/Lateral Ischemia." (Tr. at 558.) The treatment notes for that visit also reflect that Plaintiff reported intermittent substernal chest pain at that time and that Plaintiff was "[p]ositive for chest pain" and "[p]ositive for edema." (Tr. at 557-58.) In his treatment notes from September 3, 2013, Dr. Safille noted that although Plaintiff's postpartum cardiomyopathy had improved, her postpartum cardiomyopathy and her hypertension were both under "[s]uboptimal control on medical therapy." (Tr. at 559.) Finally, Dr. Safille noted that, although Plaintiff's heart failure remained stable, "[f]urther cardiac evaluation [was] indicated" based on the results of the examination and the abnormal results of the recent MPI study. (Tr. at 557-58.) None of this evidence conflicts with Dr. Safille's recommendation that same day that further cardiac testing was necessary to gauge Plaintiff's cardiac risks for a return to work. (Tr. at 537.)

Moreover, subsequent records reflect that, consistent with that conclusion, multiple additional cardiac tests were conducted over the next several weeks. Specifically, Plaintiff underwent an echocardiogram three days later on September 6, 2013, which is reflected in the records as indicating a "Small Anterior/Septal Ischemia." (Tr. at 555.) Plaintiff returned again to see Dr. Safille just over a week later, on September 16, 2013. The records for that visit reflect the "Abnormal Stress Echo," as well as Plaintiff's complaints of shortness of breath and mild to moderate chest pain. (Tr. at 554.) The treatment record reflects that Plaintiff was "[p]ositive for fatigue," and "[p]ositive for chest pain." (Tr. at 555.) Based on Plaintiff's continued complaints of chest pain and the abnormal test results, Dr. Safille again concluded

9

that "[f]urther cardiac evaluation is indicated." (Tr. at 556.) Plaintiff was scheduled for another echocardiogram and a heart catheterization. Plaintiff underwent the echocardiogram two weeks later, on September 30, 2013, and it reflects "mild global hypokinesis of LV contractility" and notes that "[o]verall left ventricular systolic function is mild-moderately impaired with an EF of 45%." (Tr. at 563-64.) Plaintiff underwent a cardiac catheterization a week later, on October 7, 2013, which showed no significant coronary artery disease but an EF of 35%. (Tr. at 570.) Plaintiff returned for an appointment with Dr. Safille less than a month later, on October 29, 2013, complaining of chest pain, and the records reflect that she was "[p]ositive for fatigue," and "[p]ositive for chest pain." (Tr. at 551-52.) An electrocardiogram was conducted, which was noted as an "Abnormal ECG" reflecting "[l]eft ventricular hypertrophy" and "[e]xtensive T wave changes . . . probably due to ventricular hypertrophy." (Tr. at 566.) Five months later, Plaintiff was treated in the emergency room for chest pain, with a diagnosis of heart palpitations. (Tr. at 567.)

Moreover, as noted in Plaintiff's brief, references to Plaintiff's condition being "improved" or "stable" do not necessarily reflect a lack of symptoms or an inconsistency with Dr. Safille's opinion. Plaintiff's treatment and testing prior to the September 3, 2013 opinion demonstrate that the improvement in Plaintiff's condition during the time in question was not as linear or dramatic as the ALJ suggests. On January 19, 2012, the alleged onset date, Plaintiff was hospitalized with congestive heart failure, an EF of 10%, and class IV heart disease under the New York Heart Association ("NYHA") Functional Classification system.[6] (Tr. at 370-

---

[6] NYHA classification, the most commonly used classification system for heart failure, "places patients in one of four categories based on how much they are limited during physical activity. . . . Class IV heart failure encompasses '[p]atients with cardiac disease resulting in inability to carry on any physical activity without discomfort. Symptoms of heart failure or the anginal syndrome may be present even at rest. If any physical

422.) Her EF improved to 20-25% by March 1, 2012, and two months later, it reached 40%. (Tr. at 442, 437.) However, these findings continue to reflect moderate to severe impairment of her left ventricular systolic function. (Tr. at 512, 510.) In addition, as noted above, Plaintiff continued to be symptomatic, experiencing fatigue and chest pain, and her EF continued to fluctuate, even with medication, and even at rest. To the extent that the ALJ repeatedly emphasized Plaintiff's stability and increased activity level as of mid-2012, the record reflects that Plaintiff wore an external defibrillator for several months preceding this period and was rendered completely sedentary for that time due to the severe nature of her heart impairment. (See Tr. at 36, 439, 458, 591.) By comparison, *any* activity constituted an increase.[7] In addition, during that mid-2012 timeframe, at an office visit on May 17, 2012, Dr. Safille noted that Plaintiff was "[p]ositive for palpitation," "[p]ositive for dizziness," and needed further testing. (Tr. at 496-97, 510.) A subsequent echocardiogram in November 2012 continued to show "global hypokinesis of LV contractility" and mildly impaired left ventricular systolic function. (Tr. at 508.) Further, as noted above, Dr. Safille documented ongoing edema and "suboptimal control" of Plaintiff's condition on September 3, 2013, the same day he issued his opinion. (Tr. at 558-59.)

While the ALJ was not required to credit Dr. Safille's opinion as to the ultimate issue of whether Plaintiff was, in fact, disabled as of that date, see 20 C.F.R. § 404.1527(d)(1), his stated reasons for discrediting Dr. Safille's opinion that further cardiac testing was necessary

---

activity is undertaken, discomfort increases.'" Foster v. Colvin, No. CIV.A. 6:13-926-TMC, 2014 WL 3829016, at *3 n.2 (D.S.C. Aug. 4, 2014).

[7] Indeed, in her testimony, Plaintiff noted that Dr. Safille only conducted chemical stress tests, rather than treadmill tests, because of her condition. (Tr. at 36-37.)

11

before such a determination could be made do not appear to be supported by substantial evidence.

Similar problems confront the ALJ's treatment of Dr. Safille's later opinion. On April 15, 2014, Dr. Safille completed a Medical Source Statement indicating that, since Plaintiff's alleged onset date, Plaintiff has not been capable of performing even sedentary work on a full-time, continuous basis, and that, even with a sit/stand option, this opinion would remain the same. (Tr. at 539-540.) Dr. Safille also noted that Plaintiff had "moderately severe" limitations in her ability to maintain attention and concentration for extended periods, "severe" limitations in the ability to perform activities within a schedule and maintain regular attendance, and "severe" limitations in her ability to complete a normal workday and workweek without interruptions from medically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 541.) Dr. Safille further noted that Plaintiff "is unable to maintain regular attendance or production in any employment. [She] requires frequent, unscheduled breaks. Totally disabled from all competitive employment for the foreseeable future. Will require lifetime medical treatment and prescription medicine." (Tr. at 542.)

With regard to this opinion, the ALJ stated that "Dr. Safille's opinions do not correlate with his treatment notes and the overall record of evidence, as described herein, does not support them. As discussed above, during the same month, Dr. Safille noted essentially normal exam findings and noted [that Plaintiff] had mild to moderate left ventricular systolic functioning." (Tr. at 20.) However, it is not clear how Dr. Safille's opinions are inconsistent with his treatment notes or the overall evidence of record. On the very day Dr. Safille

12

completed the medical source statement in question, his treatment notes recounted myriad, objective, abnormal heart findings, including an S4 gallop, a paradoxically split S2, occasional premature ventricular contractions ("PVCs" or "VPCs") including rare couplets, and a possible episode of supraventricular tachycardia ("SVT"). (Tr. at 545.) The former two findings evidence Plaintiff's continuing congestive heart failure, while the latter two findings support and account for Plaintiff's subjective complaints of heart palpitations. (Tr. at 545, 561.) The treatment records also reflect that recent electrocardiograms on March 31, 2014 and April 1, 2014 reflected "Non-specific T changes," and the April 1, 2014 electrocardiogram reflects an "Abnormal ECG" with "[l]eft ventricular hypertrophy" and "[e]xtensive T wave changes . . . due to hypertrophy and/or ischemia." (Tr. at 544, 565.) Dr. Safille also found that Plaintiff continued to have edema and shortness of breath as of April 2014 (Tr. at 543-44) and that her fatigue and malaise continued to be suboptimally controlled on medical therapy (Tr. at 545). Although he further noted that her postpartum cardiomyopathy and hypertension were "reasonably well controlled," Dr. Safille added digoxin to Plaintiff's cardiac medication regimen and recommended a return office visit in 3 months. (Id.) Overall, Dr. Safille's contemporaneous treatment notes fail to reflect "normal exam findings" as stated by the ALJ, and the ALJ never explained how Dr. Safille's treatment notes fail to correlate with his opinion that Plaintiff experiences substantial limitations in her ability to work based on her ongoing heart problems.[8]

---

[8] Moreover, the RFC presented to the vocational expert at Plaintiff's hearing is identical to the one ultimately issued in the ALJ's decision (Tr. at 15-16, 59-60), despite the fact that Dr. Safille's more recent treatment records and opinion were not available at the time of the April 8, 2014 hearing (Tr. at 30-32, 38-39, 56, 59, 62-64). Accordingly, it is unclear the extent to which the ALJ took this more recent evidence into account, if at all, when assessing Plaintiff's RFC.

Case 1:16-cv-00039-LCB-JEP   Document 15   Filed 03/02/17   Page 13 of 17

The ALJ's cursory treatment of Dr. Safille's opinions is particularly problematic in that the only other opinion evidence of record, that of the state agency physicians, addresses only the first few months of Plaintiff's alleged disability period, and offers a prospective opinion of her projected improvement as of mid-2012, rather than an opinion based on her actual functioning throughout the period at issue. (Tr. at 67, 79.) These assessments, issued on April 13, 2012 and August 30, 2012, both concluded that, within 12 months of January 19, 2012, Plaintiff "could reasonably expect to continue to improve" to an RFC for light work. (Tr. at 70, 82.) However, these predictions are based on evidence through May 2012, and do not include any of the additional evidence from later 2012 or 2013 discussed above. The ALJ assigned these opinions partial weight, but found that Plaintiff "requires slightly different restrictions" for "sitting, standing, and further environmental and mental limits" "considering her obesity, her subjective complaint of fatigue, her continued, intermittent palpitations, and her CTS." (Tr. at 20.) Nevertheless, it appears that the ALJ accepted and relied upon the state agency consultants' prediction of improvement in not only setting the RFC, but in rejecting the later opinions of Plaintiff's treating cardiologist. (Tr. at 15, 59-60.)[9]

In sum, the ALJ failed to "provide sufficient explanation for 'meaningful review' by the courts" when weighing Dr. Safille's opinions, and the summary reasons given for rejecting Dr. Safille's opinions do not appear to be supported by substantial evidence. As a result,

---

[9] In addition, the Social Security Administration utilized the wrong onset date in assessing Plaintiff's claim. In the administrative decision, the ALJ states that Plaintiff "amended" her alleged onset to January 19, 2012. (Tr. at 12.) In fact, Plaintiff alleged January 19, 2012 as her onset date in her Title II application (Tr. at 138), but all SSA documents, including the state agency RFC assessments, misstated the alleged onset date as a year earlier, i.e., January 19, 2011 (Tr. at 65, 66, 67, 68, 75, 76, 78, 79, 163, 486). It is unclear to what extent this further error may have affected the administrative determinations prior to Plaintiff's hearing, including the state agency opinions, particularly as to credibility.

14

remand is required for further evaluation of the opinion evidence and corresponding treatment notes, as well as the RFC based upon them. Moreover, additional RFC limitations, including those relating fatigue, merit additional review on remand, as set out below.

B.  Fatigue

Plaintiff also contends that the RFC limitation to "simple tasks," defined as "apply[ing] common sense understanding to carry out oral written and diagrammatic instructions" fails to adequately address her fatigue. Specifically, she argues that this restriction improperly applies a mental limitation to address a physical impairment. As Plaintiff notes, the ALJ even "couched the term 'simple work' in cognitive impairment terms, stating [that,] 'Because of her persistent fatigue, [Plaintiff] is limited to performing unskilled work as it is defined herein.'" (Pl.'s Br. at 14 (citing Tr. at 19).)[10]

In describing her fatigue, Plaintiff testified that fatigue is the primary symptom of her heart condition that affects her ability to work. (Tr. at 16, 40-41, 53.) She repeatedly noted the need to pace herself and undertake everything, including household tasks and activities of daily living, in stages. (Tr. at 39-41.) Plaintiff also testified that pain from her musculoskeletal issues and medication to control the pain further increases her fatigue and sleepiness, and she described aching all over and needing to lay down for an extended period after traveling to attend medical appointments or volunteering for part of a school day as a proctor. (Tr. at 52-53.)[11] In short, Plaintiff, along with her treating physician, described Plaintiff's fatigue as

---

[10] The regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a).

[11] At the hearing, Plaintiff testified that she served as a test proctor at her daughter's school 2 times during the past year, for no more than 4 hours each time, and that it took several days for her to recover afterwards. (Tr. at 52-53.) The ALJ cited Plaintiff's ability to "volunteer at her daughter's school" as evidence that Plaintiff's

15

physical exhaustion, requiring rest periods and a slow work pace. (Tr. at 541-42, 545.) At no point did Plaintiff allege that her fatigue impaired her judgment or ability to learn as implied by a limitation to unskilled work, nor does the ALJ offer any explanation as to how simple or unskilled work can address Plaintiff's physical limitations. In fact, as Plaintiff correctly notes, unskilled work can be physically arduous.[12] This discrepancy merits further consideration upon remand.[13]

IV. CONCLUSION

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this Recommendation. To this extent, Defendant's Motion for Judgment on the Pleadings [Doc. #13] should be DENIED, and

---

daily activities were inconsistent with her alleged limitations. (Tr. at 17.) However, it is not clear how the ability to proctor a test for part of a day 2 times in a year is inconsistent with the alleged limitations.

[12] The Court acknowledges that the ALJ in the present case limited Plaintiff to sedentary work. However, as noted above, he did so in light of Plaintiff's musculoskeletal limitations; he failed to tie any physical restrictions to Plaintiff's fatigue.

[13] Plaintiff also challenges the ALJ's finding that she can sit for six hours per day, "despite also concluding . . . that [she] suffers from the severe impairment of piriformis syndrome, bursitis in the right hip[,] and a lumbar sprain/strain." (Pl.'s Br. at 12) (citing Tr. at 14, 15). Although Plaintiff testified that her hip impairments made sitting for extended periods painful (Tr. at 16, 42, 50), sought treatment for these conditions (Tr. at 524, 529, 569, 577, 578, 579, 581, 583), and was referred to physical therapy (Tr. 583), the RFC fails to reflect any limitations relating to these problems or any explanation for their absence. Plaintiff similarly challenges the ALJ's finding that despite her carpal tunnel syndrome, Plaintiff could frequently use her upper extremities for fine and gross manipulations. The ALJ based this conclusion on a determination that "the evidence shows minimal objective findings" regarding the carpal tunnel syndrome. However, the ALJ failed to address EMG results from April 2012 showing moderate slowing of the right median nerve at the wrist involving motor and sensory fibers, as well as mild slowing of the left median nerve at the wrist involving the sensory fibers and moderate slowing of the right ulnar nerve at the elbow, and a subsequent examination in 2013 reflecting numbness in 2 fingers on her right hand, positive Tinel's in both wrists and positive Phalen's sign. (Tr. at 517, 518, 520-23.) To the extent that these omissions raise additional concerns, they can be addressed on remand.

Plaintiff's Motion for Judgment on the Pleadings [Doc. #11] should be GRANTED. However, to the extent that Plaintiff's motion seeks an immediate award of benefits, it should be DENIED.

This, the 2nd day of March, 2017.

/s/ Joi Elizabeth Peake
United States Magistrate Judge